**Michael F. McKEE,**
**Respondent-Appellant,**

v.

**Vera J. LIKINS, Appellant-Respondent,**

**James W. Edmunds, et al., Defendants.**

**Nos. 46085, 46283.**

Supreme Court of Minnesota.

Sept. 23, 1977.

---

1. For a complete discussion of these cases, see *McKee v. Likins*, Minn., 261 N.W.2d 566 (1977), filed herewith.

**568**

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Michael R. Saeger, Sp. Asst. Atty. Gen., St. Paul, for Vera Likins.

Briggs & Morgan and John R. Kenefick, St. Paul, for respondent-appellant.

Randall D. B. Tigue, Minn. Civil Liberties Union, Steven A. Grossman, Minneapolis, amicus curiae seeking reversal.

PER CURIAM.

Cross-appeals from a judgment of the Ramsey County District Court enjoining the state of Minnesota and Ramsey County from providing medical assistance to welfare recipients for abortions. This case involves the validity under the Minnesota Medicaid statute of the use of medical assistance funds for elective, nontherapeutic abortions. We hold that a policy bulletin issued by the Commissioner of Public Welfare which allowed the coverage of elective, nontherapeutic abortions constituted rulemaking without compliance with the public notice and hearing requirements of the Minnesota Administrative Procedure Act. Accordingly, we remand for compliance with rulemaking procedures.

The plaintiff in this action, Michael F. McKee, brought an action in Ramsey County District Court challenging on constitutional and statutory grounds the authority of both the state and county welfare officials to make welfare payments for the medical expenses connected with abortions. The action was brought principally as a taxpayers' suit. McKee is a resident of Ramsey County and owns real property there. As a property owner he is subject to a real estate tax, the proceedings of which are deposited in the county general revenue fund. These funds are used in part by the county welfare department for medical assistance to welfare recipients. Named as defendants in the action were the director of the Ramsey County Welfare Department, the county commissioners, the director of the county Department of Property Taxation, and the county administrator. All of these county officials are involved in assessment, appropriation, and expenditure of county tax funds. Also joined as a defendant is the Commissioner of Public Welfare for the State of Minnesota, Vera J. Likins.

The plaintiff McKee challenged the use of such funds for abortions on two main grounds: (1) That the collection and use of such funds for abortions violated his first amendment freedom of religion because he believed that abortion constituted the taking of human life; (2) that the policy bulletin issued by the Minnesota Commissioner of Public Welfare authorizing the coverage of abortions was invalid because it constituted a rule within the meaning of the Minnesota Administrative Procedure Act (Minn.St. 15.01 to 15.43) and was not issued pursuant to public notice and hearing requirements of Minn.St. 15.0412, subd. 4.

At trial, the parties stipulated to the following pertinent facts:

"6. Through the Medical Assistance Program, the Ramsey County Welfare Department reimburses physicians and health care institutions for providing medical services to eligible individuals. The funds expended under this program are derived from federal, state and county revenues.

"7. On or about February 28, 1973, defendant, Vera J. Likins, as Commissioner of the Minnesota Department of Public Welfare, issued 1973 Policy Bulletin # 12 as follows:

\*　　\*　　\*　　\*　　\*　　\*

" 'Recent decisions of the United States and Minnesota Supreme Courts have projected policy on the procedures for termination of pregnancy. Such terminations, when performed by licensed providers shall be reimbursed pursuant to the Medical Assistance Program as provided for by Title XIX of the Social Security Act and Minnesota Statutes, Chapter 256B (1971).

" 'All present regulations remain in effect for those procedures related to the above insofar as eligibility, qualifications of the procedure, and payment methods are concerned.'

\* \* \* \* \* \*

"8. Since receiving 1973 Policy Bulletin # 12, the Ramsey County Welfare Department has been paying, and at the present time continues to pay physicians' and health care institutions' fees relating to terminations of pregnancies, also known as abortions, through the Medical Assistance Program.

"9. The Department of Public Welfare is an agency within the meaning of the Minnesota Administrative Procedure Act, Minnesota Statutes, Sections 15.0411, et seq.

"10. The issuance of 1973 Policy Bulletin # 12 was not preceded by notice or public hearing under the Minnesota Administrative Procedure Act.

\* \* \* \* \* \*

"13. Plaintiff believes that he has been and continues to be injured by being required to participate in and to support the act of abortion, which he believes to be the taking of human life, by way of payment of property tax into the Ramsey County general revenue fund.

"14. As an adherent to the Roman Catholic faith and by his individual convictions, plaintiff strongly believes that he must not condone or support abortion, in any way, except where such a procedure is necessary to save the life of the pregnant woman.

"15. Plaintiff's religious and moral convictions are deeply offended by the knowledge that the general revenue of Ramsey County which include plaintiff's property tax dollars are used to pay for abortions of eligible medical assistance recipients residing in Ramsey County."

The plaintiff McKee moved for summary judgment. The defendants moved to dismiss the claim on the ground that McKee failed to state a claim upon which relief can be granted because he lacked sufficient standing to challenge such action, or in the alternative, for judgment on the pleadings. The trial court held: (1) McKee had standing; (2) as to the substance of McKee's claim, the use of such funds did not violate his first amendment rights; (3) the policy bulletin was invalid because of the failure of the Commissioner to follow the appropriate rulemaking procedures. Accordingly, the trial court granted partial judgment to the defendants on the first amendment claim, and granted partial judgment to the plaintiff McKee on his administrative law claim. As part of its judgment, the trial court enjoined the state of Minnesota and the county of Ramsey from expending any medicaid funds for the payment of abortions until the Department of Public Welfare complies with the APA rulemaking procedure. Each party appealed that part of the judgment of the trial court unfavorable to them. Of the defendants, however, only the Commissioner of Public Welfare appealed the decision below. In a separate proceeding this court ordered the injunction suspended during the pending of this appeal.

Before proceeding to the merits of this appeal we must consider whether McKee has standing to bring this action. The trial court ruled in the affirmative. We agree.

## I. STANDING

■ The plaintiff McKee alleges two bases for standing to seek a declaratory judgment that the administrative bulletin issued by the Commissioner is defective [1] and thus

---

1. The procedure for challenging the validity of an administrative rule is set forth in Minn.St. 15.0416 and 15.0417. The first provides:

"The validity of any rule may be determined upon the petition for a declaratory judgment thereon, addressed to the district court where the principal office of the agency is located, when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner. The agency shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question."

warrants an injunction against the use of state monies for elective, nontherapeutic abortions: (1) interference with the free exercise of his religion, a first amendment claim; and (2) his status as a taxpayer.[2]

While we question plaintiff's standing to sue on first amendment grounds, we deem it unnecessary to decide that issue because we hold that he does have standing to bring suit as a taxpayer.

In pertinent part, section 15.0416 of the Minnesota Administrative Procedure Act provides with respect to the determination of the validity of rules:

"The validity of any rule may be determined * * * when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner. * * * *"

This court previously has stated that "injury in fact" is the test for standing to challenge administrative action under the state act, absent a discernible legislative intent to the contrary in a given case. *Snyder's Drug Stores v. Minnesota Bd. of Pharm.*, 301 Minn. 28, 32, 221 N.W.2d 162, 165 (1974). Accord, *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1212, note 4 (8 Cir. 1972). Thus, the issue which this case presents is whether expenditure of tax monies under a rule which the plaintiff taxpayer alleges was adopted by a state official without compliance with the statutory rule-making procedures, is "injury in fact" within the meaning of the Minnesota Administrative Procedure Act.

In contrast with the Federal courts,[3] it generally has been recognized that a state or local taxpayer has sufficient interest to challenge illegal expenditures.[4]

---

2. The second provides:

"In proceedings under section 15.0416 the court shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rule-making procedures."

The declaratory judgment statute itself (Minn.St. c. 555) does not provide a separate test for standing. Rather, the statute is directed towards the "ripeness" of a dispute, i. e., "when" it may be brought; standing, on the other hand, is concerned with "who" may bring a suit.

2. The plaintiff does not assert that he is relying on the protection of the constitutional rights of others, another basis for standing. See, generally, Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423 (1974).

3. The current test for standing as a Federal taxpayer to challenge federal expenditures was set forth by the court in *Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 1954, 20 L.Ed.2d 947, 963 (1968):

"The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. * * * Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction."

Accord, *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2962, 41 L.Ed.2d 706 (1974). See, generally, Davis, *Standing: Taxpayers and Others*, 35 U. of Chi. L.Rev. 601 (1968); Stuart, *Standing to Contest Federal Appropriations: The Supreme Court's New Requirements*, 22 SW.L.J. 612 (1968); Note, *Taxpayer Standing to Litigate*, 61 Geo. L.J. 747 (1973).

4. Two principal rationales have been advanced for the use of different tests for taxpayers' suits on the Federal and state level, first, the greater number of taxpayers on the Federal level and hence the greater disruption a single taxpayer might have on the large amount of Federal when compared to state spending, see, *Massachusetts v. Mellon*, 262 U.S. 447, 487, 43 S.Ct. 597, 601, 67 L.Ed. 1078, 1085 (1923), and second, the large percentage of federal funds devoted to the sensitive areas of defense and foreign affairs, see, Note, *Taxpayers' Suits: A*

Thus, as early as 1888, Mr. Justice Mitchell declared for this court in a case in which " 'freeholders, tax-payers, and legal voters' " of a county brought an action to compel county officers to perform certain acts required by law that "where the object is * * * to enforce a public duty * * any private person may move to enforce it." *State v. Weld*, 39 Minn. 426, 428, 40 N.W. 561, 562 (1888). Later, in *Oehler v. City of St. Paul*, 174 Minn. 410, 417, 219 N.W. 760, 763 (1928), this court again reiterated that—

> " * * * it is well settled that a taxpayer may, when the situation warrants, maintain an action to restrain unlawful disbursements of public moneys; to recover for the use of the public subdivision entitled thereto money that has been illegally disbursed, as well as to restrain illegal action on the part of public officials."

More recently, this court stated that "it has been generally recognized that a taxpayer has sufficient interest to enjoin illegal expenditures of both municipal and state funds." *Arens v. Village of Rogers*, 240 Minn. 386, 392, 61 N.W.2d 508, 513 (1953), appeal dismissed *for want of a substantial Federal question*, 347 U.S. 949, 74 S.Ct. 680, 98 L.Ed. 1096 (1954). Thus, while the activities of governmental agencies engaged in

public service ought not to be hindered merely because a citizen does not agree with the policy or discretion of those charged with the responsibility of executing the law, the right of a taxpayer to maintain an action in the courts to restrain the unlawful use of public funds cannot be denied. Taxpayers are legitimately concerned with the performance by public officers of their public duties. Accordingly, we hold that a taxpayer suing as a taxpayer has standing to challenge administrative action which allegedly is rulemaking adopted without compliance with the statutory notice requirements.[5]

## II. MEDICAID PROGRAM

Medical Assistance (Medicaid) is the principal national assistance program covering medical care. It was established in 1965 by Title XIX of the Social Security Act, 42 U.S.C.A., §§ 1396–1396d, and created a program under which participating states may provide federally-funded medical aid to needy persons.[6] Minnesota's medical assistance program is authorized by Minn.St. c. 256B and administered by the Minnesota Department of Public Welfare.

■ The Medicaid program, as a project in cooperative federalism, is administered jointly by the Federal and individual state

*Survey and Summary*, 69 Yale L.J. 895, 918 (1960). Other justifications advanced include the more intense coverage of official activities on the Federal level (and hence greater public exposure), the more stringent "case or controversy" requirement under the Federal constitution, and the sheer size of the Federal budget. See, Note, *supra*, 918.

See, 2 Cooper, State Administrative Law, pp. 555 to 558; 3 Davis, Administrative Law Treatise, § 22.10; Jaffe, Judicial Control of Administrative Action, pp. 459 to 494 (1965); 18 McQuillin, Municipal Corporations (3d ed. Rev.) § 52; Risenfeld, *Judicial Control of Administrative Actions by Means of the Extraordinary Remedies in Minnesota*, 37 Minn.L.Rev. 1, 25; 74 Am.Jur.2d, Taxpayers' Actions, § 7; Annotation, 58 A.L.R. 588; Note, *Taxpayers' Suits: A Survey and Summary*, 69 Yale L.J. 895.

5. The plaintiff in this action alleges the violation by a public official of a general duty owed to the public. In contrast, in *Snyder's Drug Stores v. Minnesota Bd. of Pharm.*, 301 Minn. 28, 221 N.W.2d 162 (1974), the only other case

in which this court has dealt with standing under the Minnesota Administrative Procedure Act, the plaintiff challenged the effect of a regulation, otherwise properly adopted, on a given group of consumers. While we do not decide the question here, there would appear to be stronger policy reasons to allow a challenge to the performance of mandatory duties by public officials than a properly promulgated regulation itself since the performance of clear public duties by public employers affects the public at large while the effect of a regulation itself may be more limited.

6. For general background on the Medicaid program, see, Silver & Edelstein, *Medicaid: Title XIX of the Social Security Act—A Review and Analysis* (pts. I–III), 4 Clearinghouse Rev. 239, 305, 348 (1970); Butler, *The Medicaid Program: Current Statutory Requirements and Judicial Interpretations*, 8 Clearinghouse Rev. 7 (1974); Stevens & Stevens, *Medicaid: Anatomy of a Dilemma*, 35 Law & Contemp.Prob. 348 (1970).

governments. To encourage states to provide medical coverage, Title XIX established a program whereby the Federal government would supply 50 percent to 83 percent of the funds (see, 42 U.S.C.A. § 1396d(b)) depending on state income, to participating states if they would establish plans for medical assistance which complied with the general program requirements with respect to types of persons covered, types of services offered, and the minimum conditions which health care providers must meet. The Federal medicaid statute prescribes certain categories of service which states have to cover, and permits states, at their option, to include additional services. Within these general guidelines states may define the scope, duration, and amount of services available so long as the state plan has "reasonable standards * * * for determining * * * the extent of medical assistance under the plan which * * * are consistent with the objectives of [Title XIX]." 42 U.S.C.A., § 1396a(a)(17). Within the statutory stricture of "reasonableness," however, a state has considerable discretion in forming the content of its medicaid program.

With respect to persons covered, the Federal statute requires a state, if it participates, to provide recipients of Federal programs for dependent children, as well as the aged, blind, and disabled (the "categorically needy") with at least the following general services (commonly known as "mandatory" or "required services"):

—inpatient hospital services
—outpatient hospital services
—other laboratory and X-ray services
—skilled nursing facility services, periodic screening and diagnosis of children, and family planning services
—physician's services.

42 U.S.C.A., §§ 1396a(a)(13)(B), 1396d(a)(1) to (5).

In addition, the statute allowed a state, if it so desired, to include the following so-called "optional" services in 42 U.S.C.A., § 1396d:

"(6) medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law;

"(7) home health care services;

"(8) private duty nursing services;

"(9) clinic services;

"(10) dental services;

"(11) physical therapy and related services;

"(12) prescribed drugs, dentures, and prosthetic devices; and eyeglasses * * *;

"(13) other diagnostic, screening, preventive and rehabilitative services;

"(14) inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for tuberculosis or mental diseases;

"(15) intermediate care facility services;

"(16) * * * inpatient psychiatric hospital services for individuals under age 21 * * *;

"(17) any other medical care, and any other type of remedial care recognized under State law, specified by the Secretary; * * *"

In addition, a state, if it so desired, could also provide coverage for persons who are "medically needy," i. e., generally those persons whose resources are sufficient to cover ordinary living expenses, but not medical care. These are persons who would be eligible for Federally-aided financial assistance if they had less income and resources. Any service offered to the categorically needy also must be offered to the medically needy. See, 42 U.S.C.A. § 1396a(a)(10)(B).

Although the Federal statute prescribes the categories of services which participating states must cover and gives states the option of adding other specified services, it does not define the extent of each service, leaving this task largely up to the states. See, 42 U.S.C.A., §§ 1396a(10), (14), (17), and 1396d(a). Thus, a state may define the scope, duration, and amount of provided services. The regulations under the Federal statute only specify the following guidelines for the state plan requirements:

"[Such plans must] [s]pecify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needy, if the plan includes this latter group. Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose. * * * Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures." 45 C.F.R. § 249.10(a)(5)(i).

Minnesota began to participate in the medicaid program in 1967 when the legislature passed the state medicaid statute, now codified as Minn.St. c. 256B. The policy of the act is stated in § 256B.01 as follows:

"Medical assistance for needy persons whose resources are not adequate to meet the cost of such care is hereby declared to be a matter of state concern. To provide such care, a statewide program of medical assistance, with free choice of vendor, is hereby established."

The statute covers both the categorically and the medically needy (see, Minn.St. 256B.06) and "medical assistance" is defined in Minn.St. 256B.02, subd. 8 to include:

"(1) Inpatient hospital services.

"(2) Skilled nursing home services.

"(3) Physicians' services.

"(4) Outpatient hospital or clinic services.

"(5) Home health care services.

"(6) Private duty nursing services.

"(7) Physical therapy and related services.

"(8) Dental services.

"(9) Laboratory and x-ray services.

"(10) The following if prescribed by a licensed practitioner: drugs, eyeglasses, dentures, and prosthetic devices.

"(11) Diagnostic, screening, and preventive services.

"(12) Health care pre-payment plan premiums and insurance premiums if paid directly to a vendor and supplementary medical insurance benefits under Title XVIII of the Social Security Act.

"(13) Transportation costs incurred solely for obtaining medical care when paid directly to an ambulance company, common carrier, or other recognized providers of transportation services.

"(14) Any other medical or remedial care licensed and recognized under state law."

This listing covers all general types of services, both required and elective, allowed by the Federal statute.

The Minnesota medicaid statute also required the Department of Public Welfare to promulgate regulations to carry out and enforce the statute. See, Minn.St. 256B.04, subd. 2. Accordingly, the department duly enacted DPW 47 which defines more extensively the services covered under each of the general areas enumerated in the state statute and sets forth other regulations for the administration of the medical assistance program and the review of services. Of importance here are the following regulations defining the scope of various services:

"(m) Types of services for which medical assistance payments may be made

"(1) Inpatient hospital care. 'Inpatient Hospital Services' are those items and service ordinarily furnished by a hospital for the care and treatment of inpatients that are provided under the direction of a physician or dentist in an institution that is maintained primarily for treatment and care of patients with disorders other than tuberculosis or mental diseases and that is licensed and formally approved as a hospital by the Minnesota Department of Health; * * *. Care in a licensed hospital shall be provided and paid for only when ordered by a physician and after the county has received notification of such hospitalization on the prescribed Department of Public Welfare form from the receiving facility. Such notification shall be made within three working days after admission of the patient. The county welfare agency shall appropriately respond within three working days after receipt of such notice.

\* \* \* \* \* \*

"(2) Outpatient hospital services. Medical Assistance payments may be made for emergency, preventive, diagnostic, therapeutic, rehabilitative, and palliative services if furnished at the outpatient department of an approved hospital.

\* \* \* \* \* \*

"(5) Physician services—dental services. Medical Assistance payments may be made for all services provided by a licensed physician or licensed dentist. \* \* \* Elective surgery shall always require prior authorization. \* \* \*

\* \* \* \* \* \*

"(11) Other diagnostic, screening, preventive, and rehabilitative service. Medical Assistance payments may be made for these services to eligible recipients unless unusual services are involved. When there exists a question about the propriety of the service or its costs, consultation with the appropriate medical advisory committee must be sought. Unresolved questions shall be referred to the State Agency for decision." DPW 47(m).

In addition, DPW 47 established certain standards for the individual counties:

"(a) County Medical Assistance plan. Counties shall, with the advice and cooperation of the local or administrative area medical advisory or other provider committee, administer the Medical Assistance Program in accordance with the rules, regulations, and policies of the Minnesota Department of Public Welfare. In its administration of the Medical Assistance Program, each local agency shall provide such methods and procedures relating to the utilization review by provider of, and the payment for, medical services available under the plan as may be necessary to safeguard against abuse and/or unnecessary utilization of such care and services \* \* \*." DPW 47(a).

All of the portions of the Federal and state statutes and regulations quoted above were passed before the decisions of the United States Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *Doe v. Bolton*, 410 U.S. 179,

93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In *Roe v. Wade* the court held that a state criminal abortion law which excepted from criminality only a life-saving procedure on the mother's behalf without regard to the stage of her pregnancy violated the due process clause of the Fourteenth Amendment. The decision, by way of summary, concluded with the following directive:

"1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life saving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

"(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

"(c) For the stage subsequent to viability the State, in promoting its interest in the potentiality of human life, may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 410 U.S. 164, 93 S.Ct. 732, 35 L.Ed.2d 183.

In the companion case of *Doe v. Bolton*, the court held unconstitutional a Georgia statute which permitted an abortion only if one of the following conditions existed:

"(1) A continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health; or

"(2) The fetus would very likely be born with a grave, permanent and irremediable mental or physical defect; or

"(3) The pregnancy resulted from forcible or statutory rape." Ga.Code, § 26–1202 (1971).

Eleven days later—on February 2, 1973—this court in the companion cases of *State v. Hodgson*, 295 Minn. 294, 204 N.W.2d 199 (1973), and *State v. Hultgren*, 295 Minn. 299, 204 N.W.2d 197 (1973), followed *Roe v. Wade* and *Doe v. Bolton* and held that Minn.St. 617.18, the Minnesota criminal abortion statute, was unconstitutional.[7] In response, on February 28, 1973—37 days after the Federal decisions and 26 days after the state decisions—the commissioner of Public Welfare issued the following policy bulletin:

"STATE OF MINNESOTA
"Department of Public Welfare
"Centennial Office Building
"St. Paul, Minnesota 55155
February 28, 1973

"1973 Policy Bulletin # 12
"To: Chairman, County Welfare Board
ATTENTION: Welfare Director

"SUBJECT: Termination of Pregnancy

"Recent decisions of the United States and Minnesota Supreme Courts have projected policy on the procedures for termination of pregnancy. Such terminations, when performed by licensed providers shall be reimbursed pursuant to the Medical Assistance Program as provided for by Title XIX of the Social Security Act and Minnesota Statutes, Chapter 256B (1971).

"All present regulations remain in effect for those procedures related to the above insofar as eligibility, qualifications of the procedure, and payment methods are concerned.

Very truly yours,
/s/ VERA J. LIKINS
Commissioner"

The plaintiff McKee argues that this policy bulletin was ineffective because it violated the notice provisions of the Minnesota APA. On the other hand, the commissioner contended initially that the funding of abortions was mandated by the United States Constitution and, alternatively, that the policy bulletin was not a "rule" within the meaning of the Minnesota APA. At oral argument both parties argued the constitutionality of barring the use of government funds for abortions. A ruling favorable to the state on that issue by the United States Supreme Court would have been controlling and precluded consideration of the APA issue. Subsequent to those arguments, however, the United States Supreme Court in the cases of *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), held (1) that the provisions of Title XIX of the Social Security Act did not *require* a state, as a condition of participation, to include the funding of elective abortions in its medicaid program; and (2) that the equal protection clause did not require a state that elects to fund expenses incident to childbirth also to provide funding for elective abortions.

In the *Beal* decision, the court upheld a Pennsylvania regulation which limited financial assistance to those abortions that were certified by physicians as medically necessary.[8] In reaching its decision that

---

**7.** A second statute was later enacted in 1974 (Minn.St. 145.411 to 145.416), but it ultimately was held unconstitutional in part. See, *Hodgson v. Anderson*, 378 F.Supp. 1008 (D.Minn. 1974), appeal dismissed for want of jurisdiction sub nom, *Spannaus v. Hodgson*, 420 U.S. 903, 95 S.Ct. 819, 42 L.Ed.2d 832 (1975), affirmed in part, reversed in part sub nom. *Hodgson v. Lawson*, 542 F.2d 1350 (8 Cir. 1976).

**8.** The Pennsylvania regulation deemed the following to be "medically necessary": "(1) There is documented medical evidence that continuance of the pregnancy may threaten the health of the mother;

"(2) There is documented medical evidence that an infant may be born with incapacitating physical deformity or mental deficiency; or

"(3) There is documented medical evidence that a continuance of a pregnancy resulting from legally established statutory or forcible rape or incest, may constitute a threat to the mental or physical health of a patient; and

"(4) Two other physicians chosen because of their recognized professional competency have examined the patient and have concurred in writing; and

"(5) The procedure is performed in a hospital accredited by the Joint Commission on Accreditation of Hospitals."

Title XIX did not require a state to fund under its medicaid program the cost of all abortions that were permissible under state law, the court relied on the fact that Title XIX lacked a specific provision with respect to abortion, that the prevailing state law at the time of the passage of Title XIX in 1965 precluded the use of elective abortions, and that the agency charged with the administration of Title XIX—the Department of Health, Education, and Welfare—had taken the position that the statute allowed but did not require states to fund nontherapeutic abortions. The court emphasized, however, that Title XIX left a state free to provide coverage for nontherapeutic abortions if it so desired. Thus, the issue which this court must now consider is whether the Minnesota medicaid statute or any duly-adopted regulation of the Minnesota Department of Welfare enacted pursuant to that statute requires the funding of nontherapeutic abortions. It should be noted, however, that this case does *not* present any question whether the Minnesota Constitution requires the funding of nontherapeutic abortions, since the issue was not raised by the parties at trial or at oral argument before this court, or whether as a matter of statutory construction such abortions must be allowed under state welfare statutes other than the medicaid statute, such as Minn.St. c. 261 which covers the Poor Relief program.

The only question raised in this case and therefore the only question before this court to be decided by it is whether the present state medicaid statute mandates the coverage of elective, nontherapeutic abortions.

The language of the Minnesota medicaid statute does not make clear the status of elective, nontherapeutic abortions. The principal source of concern is subpart (m)(5) of DPW Rule 47, which provides in pertinent part that:

"Elective surgery shall always require prior authorization." The term "elective surgery" would appear to cover nontherapeutic abortions.[9] The thrust of the policy bulletin issued by the commissioner, however, as it has in effect been interpreted by the Department of Public Welfare was either to declare that abortions, whether therapeutic or nontherapeutic were not elective surgery, or to declare that such procedures automatically had prior authorization. Thus, if a source is to be found for the coverage of nontherapeutic abortions it must be in the policy bulletin issued by the commissioner. Therefore, the validity of the issuance of the bulletin itself must be considered in light of the application of the rulemaking requirements under the Minnesota APA.

### III. RULEMAKING

Before we address the specific claims advanced by the parties as to the validity of the policy bulletin issued by the commissioner of Public Welfare as it affects elective abortions, some preliminary observations about the rulemaking process in administrative law may be beneficial.

■ "Rule" as defined by the Minnesota Administrative Procedure Act in 1973 [10] (Minn.St.1974, § 15.0411, subd. 3) provided:

---

9. ·Surgery" has been defined as "[t]herapy of a distinctly operative kind, such as cutting operations, the reduction and putting up of fractures and dislocations, and similar manual forms of treatment." *Napier v. Greenzweig*, 256 F. 196, 197 (2 Cir. 1919), and as "[t]he art or practice of healing by manual operation * * *." Black, Law Dictionary (4 ed.) p. 1612. Accord, *Goss v. Goss*, 102 Minn. 346, 351, 113 N.W. 690, 692 (1907) ("a surgeon is a physician who treats bodily injuries and ills by manual operations and the use of surgical instruments and appliances"). See, also, *State v. Houck*, 32 Wash.2d 681, 695, 203 P.2d 693, 701 (1949)

(practice of obstetrics covered). See, generally, 40A Wd. & Phr. (Perm.ed.) p. 468.

10. This definition was amended by L.1975, c. 380, to correspond, effective July 1, 1976, generally with the definition of "rule" (but not necessarily the exceptions) in § 551(4) of the Federal APA and § 1(7) of the Revised Model State Administrative Procedure Act. It now provides:

"Subd. 3. 'Rule' includes every agency statement of general applicability and future effect, including the amendment, suspension, or repeal thereof, made to implement or make specific the law enforced or administered by it

" 'Rule' includes every regulation, including the amendment, suspension, or repeal thereof, adopted by an agency, whether with or without prior hearing, to implement or make specific the law enforced or administered by it or to govern its organization or procedure, but does not include (a) regulations concerning only the internal management of the agency or other agencies, and which do not directly affect the rights of or procedure available to the public; or (b) rules and regulations relating to the management, discipline, or release of any person committed to any state penal institution; or (c) rules of the division of game and fish published in accordance with Minnesota Statutes, section 97.53; or (d) regulations relating to weight limitations on the use of highways when the substance of such regulations is indicated to the public by means of signs."

Upon reflection, it is obvious that the legislative scheme in so defining rule was to include agency activities within the general definition of "rule" and then to exclude such specific activity as it deemed beneficial to the concerns of efficient government and public participation. Cf. 1 Cooper, State Administrative Law, pp. 107 to 118; Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L.Rev. 731, 824 to 845 (1975). Thus, there can be no doubt initially that the policy bulletin falls within the general definition of rule. Therefore, the next inquiry must be whether the bulletin falls within any recognized exceptions to the definition of rule.

■ Although not so denominated expressly by the courts in the earliest decisions involving administrative rules, three definite types of rules came to be delineated by the commentators and later court decisions, with varying corresponding consequences dependent upon the particular classification a given rule was placed into—procedural, legislative, or interpretative.[11]

■ Without getting into a detailed discussion of whether the department, by Policy Bulletin No. 12, attempted to promulgate a procedural, legislative, or interpretative rule, we hold that it involved a question of social and political policy so

---

or to govern its organization or procedure, but does not include (a) rules concerning only the internal management of the agency or other agencies, and which do not directly affect the rights of or procedure available to the public; or (b) rules of the commissioner of corrections relating to the internal management of institutions under his control and those rules governing the inmates thereof prescribed pursuant to section 609.105; or (c) rules of the division of game and fish published in accordance with section 97.53; or (d) rules relating to weight limitations on the use of highways when the substance of such rules is indicated to the public by means of signs; or (e) opinions of the attorney general." Commentary on the 1975 amendment indicates that the change was necessary to resolve the ambiguity caused by the use of both the terms "regulation" and "rule" in the statute, which lead several state agencies to engage in informal rulemaking. See, Triplett & Nobles, *Rule-Making Under Minnesota's Administrative Procedure Act: 1975 Amendments*, Hennepin County Lawyer 14 (July-August 1975).

11. For general background on this issue, see, 1 Cooper, State Administrative Law, pp. 173 to 176; Cooper, Administrative Agencies and the Courts, pp. 254 to 262; 1 Davis, Administrative Law Treatise, § 5.01, et seq.; Davis, Adminis-

trative Law of the Seventies, pp. 138 to 166; Gellhorn, Administrative Law and Process, pp. 12 to 137; Asimov, *Public Participation in the Adoption of Interpretative Rules and Policy Statements*, 75 Mich.L.Rev. 521 (1977); Bonfield, *Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy Under the A.P.A.*, 23 A.B.A.Ad.L.Rev. 101 (1971); Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L.Rev. 731, 858 to 860 (1975); Davis, *Administrative Rules—Interpretative, Legislative, and Retroactive*, 57 Yale L.J. 919 (1948); Lee, *Legislative and Interpretative Regulations*, 29 Geo.L.J. 1 (1940). Note, *Administrative Law—The Legislative-Interpretative Distinction: Semantical Feinting with an Exception to Rulemaking Procedures*, 54 N.C.L. Rev. 421 (1976); Comment, *A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy*, 43 U. of Chi.L.Rev. 430 (1976). See, also, *Batterton v. Francis*, 432 U.S. 416, 425, note 9, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448, 456 (1977) (recognizing distinctions).

important to the public as a whole as to require that the rulemaking process of the Minnesota Administrative Procedure Act be followed.

The specific language in the Minnesota APA at the time of the issuance of the policy bulletin would appear to require either legislative or interpretative rules to follow the notice and public hearing requirements. Minn.St.1974, § 15.0413, subd. 1, provided in part in 1973:[12]

"* * * Standards or statements of policy or *interpretations* of general application and future effect shall not have the effect of law unless they are adopted as a rule in the manner prescribed by section 15.0412. This section does not apply to opinions of the attorney general." (Italics supplied.)

While under this as well as the present version of the Minnesota APA the exclusion from the definition of "rule" for attorney general opinions (see, Minn.St. 15.0411, subd. 3(d)) might lessen somewhat the need for such a formal rule on issues such as the present one, there was no indication in the statute at the time of the issuance of the policy bulletin that a rule of general application would be excluded from the definition of rule and thus not require public notice and hearing. In fact, there appears to be a provision specifically precluding action such as that taken. Therefore, we must find that the policy bulletin could not be exempt from the notice and public hearing requirements of the statute. An important political issue like public financing of abortions ought to, ideally, be decided by the legislature where everyone can have his say. If the legislature has placed the issue in the hands of an administrative official that official's decision ought to be based on a careful expression of all interested viewpoints. As Justice Powell wrote in *Maher v. Roe*, 432 U.S. 464, 479, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977):

"The decision whether to expend state funds for nontherapeutic abortion is fraught with judgments of policy and value over which opinions are sharply divided. * * * Indeed, when an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature."

Therefore, it logically follows that if the legislature delegates authority to an administrative agency and if the administrative agency elects to adopt rules pursuant to that authority, the procedure outlined in the Administrative Procedure Act should be followed in promulgating those rules.

The trial court is affirmed on the issue of elective, nontherapeutic abortions only.

---

**12.** This language was repealed by L.1975, c. 380, § 3. Under the current version of the Minnesota APA, interpretative rules are still covered by the use of the phrase "or make specific the law enforced or administered by it" in the general definition of rule. See, Minn.St. 15.0411, subd. 3.