STATE OF MINNESOTA

IN SUPREME COURT

A23-1940

Court of Appeals
                                        Hudson, C.J.
         Took no part, Hennesy, Gaïtas, J.J.

Minnesota Voters Alliance, et al.,

        Appellants,

vs.
                                       Filed: August 7, 2024
                              Office of Appellate Courts

Tom Hunt, et al.,

        Respondents,

Steve Simon, et al.,

        Respondents,

Jennifer Schroeder, et al.,

        Respondents.

_____

Douglas P. Seaton, James V. F. Dickey, Allie K. Howell, Upper Midwest Law Center, Golden Valley, Minnesota, for appellants.

Brad Johnson, Anoka County Attorney, Jason J. Stover, Robert I. Yount, Assistant Anoka County Attorneys, Anoka, Minnesota, for respondents Tom Hunt, et al.

Keith Ellison, Attorney General, Nathan J. Hartshorn, Allen Cook Barr, Assistant Attorneys General, Saint Paul, Minnesota, for respondent Steve Simon, et al.

Craig S. Coleman, Jeffrey P. Justman, Evelyn Snyder, Erica Abshez Moran, Faegre Drinker Biddle & Reath LLP, Minneapolis, Minnesota; and

1

Ehren M. Fournier, Faegre Drinker Biddle & Reath LLP, Chicago, Illinois; and

Teresa J. Nelson, David P. McKinney, American Civil Liberties Union of Minnesota, Minneapolis, Minnesota, for respondents Jennifer Schroeder, et al.

Bryna Godar, State Democracy Research Initiative, University of Wisconsin Law School, Madison, Wisconsin, for amicus curiae Legal Scholars.

Devin T. Driscoll, Rachel L. Dougherty, Sarah Theisen, Fredrickson & Byron, P.A., Minneapolis, Minnesota, for amicus curiae League of Women Voters Minnesota.

_____

## S Y L L A B U S

Taxpayer standing exists only when the central dispute involves alleged unlawful disbursements of public funds; when standing would not otherwise exist to challenge a substantive law, a taxpayer cannot manufacture standing by pointing to expenditures that are incidental to implementing the law.

Affirmed.

## O P I N I O N

HUDSON, Chief Justice.

This action arises from the Legislature's passage of the Re-Enfranchisement Act, which addresses the voting rights of individuals convicted of felony-level offenses. *See* Act of Mar. 3, 2023, ch. 12, 2023 Minn. Laws 64, 64–68. Individual taxpayers Mary Amlaw, Ken Wendling, and Tim Kirk ("the Taxpayers"), and an association to which they belong, Minnesota Voters Alliance ("their Association"), brought a petition for a writ of quo warranto or declaratory judgment against state officials who are participating in the implementation of the Re-Enfranchisement Act. The Taxpayers and their Association

2

claim that one provision of the Re-Enfranchisement Act allows individuals convicted of a felony to vote based on the restoration of a *single* civil right and allege that another provision unlawfully authorizes the use of public funds to educate and notify people about the new voting provision. According to the Taxpayers and their Association, the new voting provision violates Minnesota Constitution, Article VII, Section 1, which prohibits a person convicted of a felony from voting "unless restored to *civil rights*," plural. (Emphasis added.) The Taxpayers and their Association do not contend that it is unlawful to use public funds for voter education. Instead, they argue that if the new voting provision violates Minnesota Constitution, Article VII, Section 1, it is unlawful to use public funds to educate and give notice to people about the new voting provision.

To bring this action, the Taxpayers and their Association must have a sufficient stake in a justiciable controversy to seek relief from a court, which is commonly referred to as "standing." To satisfy this requirement, the Taxpayers rely on the common law doctrine of taxpayer standing, and their Association relies on associational standing. In denying the petition filed by the Taxpayers and their Association, the district court determined that they lacked standing. We granted accelerated review. Because we conclude that the Taxpayers lack taxpayer standing and their Association lacks associational standing, we affirm.

## FACTS

Article VII of the Minnesota Constitution broadly protects the right to vote: "Every person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled

3

to vote in that precinct." Minn. Const. art. VII, § 1. There are, however, certain enumerated restrictions on the right to vote in the Minnesota Constitution. The following persons may not vote: "a person who has been convicted of treason or felony, unless restored to civil rights; a person under guardianship, or a person who is insane or not mentally competent." *Id.* In discussing the constitutional restriction on a person convicted of a felony's right to vote, we have said,

> [T]he rule under Article VII, Section 1, of the Minnesota Constitution is as follows: a person convicted of a felony cannot vote in Minnesota unless the person's right to vote is restored by some affirmative act of, or mechanism established by, the government. For instance, the affirmative act could be an absolute pardon that nullifies that felony conviction upon which the constitutional deprivation of the right to vote is based or *a legislative act that generally restores the right to vote upon the occurrence of certain events*.

*Schroeder v. Simon*, 985 N.W.2d 529, 545 (Minn. 2023) (emphasis added).

Following *Schroeder*, the Governor signed into law the Re-Enfranchisement Act, and it became effective on July 1, 2023. Act of Mar. 3, 2023, ch. 12, 2023 Minn. Laws 64, 64–68. The new voting provision of the Re-Enfranchisement Act amended Minnesota Statutes section 201.014 (2022) by adding the following language:

> An individual who is ineligible to vote because of a felony conviction has the civil right to vote restored during any period when the individual is not incarcerated for the offense. If the individual is later incarcerated for the offense, the individual's civil right to vote is lost only during that period of incarceration.

Act of Mar. 3, 2023, ch. 12, § 1, 2023 Minn. Laws at 64. The notice and education provisions of the Re-Enfranchisement Act direct the Secretary of State to publish information about the voting rights of people who have been convicted of a crime, direct county auditors to provide accurate voting information at polling places, and direct prison

4

officials to provide notice of the restoration of the right to vote and voter registration applications to people being released from incarceration for a felony level offense. *Id.*, ch. 12, §§ 3, 4, 6, 2023 Minn. Laws at 65–68. The Legislature approved a one-time appropriation of $14,000 from the general fund for the Secretary of State to implement the provisions of the Re-Enfranchisement Act. *Id.*, ch. 12, § 8, 2023 Minn. Laws at 68. Additionally, the Legislature appropriated $200,000 to the Office of the Secretary of State "to develop and implement an educational campaign relating to the restoration of the right to vote to formerly incarcerated individuals." Act of May 24, 2023, ch. 62, art. 1 § 6, 2023 Minn. Laws 2452, 2456.

On June 29, 2023, the Taxpayers and their Association[1] filed a petition for a writ of quo warranto or declaratory judgment, alleging that the state officials implementing the provisions of the Re-Enfranchisement Act were acting unlawfully. In support of their petition, the Taxpayers and their Association asserted that Article VII, Section 1 of the Minnesota Constitution, which states that a person who has been convicted of a felony may not vote "unless restored to civil rights," precludes the Legislature from restoring only the singular right to vote. According to the Taxpayers and their Association, the Legislature was required to restore all civil rights, or multiple civil rights, for the right to vote to be

---

[1]     The individual taxpayers—Mary Amlaw, Ken Wendling, and Tim Kirk—are taxpayers and residents of Anoka County. Minnesota Voters Alliance is a Minnesota nonprofit corporation that states that it advocates for the interests asserted by the individual appellants, who are each long-time supporters and volunteers with the Minnesota Voters Alliance.

5

restored. Voters with felony convictions filed a motion to intervene as of right or permissively. The district court granted intervention as of right.

The district court denied the petition filed by the Taxpayers and their Association, concluding that they lacked standing. After discussing the relevant law on taxpayer standing, the district court concluded that taxpayer standing requires a challenge to an illegal expenditure or waste of tax money. The court determined that the Taxpayers failed to satisfy this requirement because they "d[id] not challenge a specific disbursement of public funds," but instead, used the Legislature's appropriations as "a mere jumping-off point" "to challenge something that has nothing to do with money: namely, the eligibility of some citizens to vote." The district court rejected the Taxpayers' argument that "any incidental expenditure of public funds related to the implementation of a law confers standing on any taxpayer who wishes to bring a lawsuit challenging any aspect of that law." It explained that granting taxpayer standing in this case "would render the very concept of taxpayer standing meaningless" because "practically every law entails at least *some* public expenditure."

After discussing the relevant law on associational standing, the district court concluded that a requirement of associational standing is that a member of the association has standing. Because the Taxpayers lacked standing, the court reasoned that the requirements of associational standing were not satisfied in this case.[2]

We granted accelerated review.

---

[2] Despite its determination that the parties lacked standing, in the interest of thoroughness, the district court addressed the petition on its merits. Because we affirm the

6

## ANALYSIS

To exercise our judicial power, we must have jurisdiction. *See In re Application of the Senate*, 10 Minn. 78, 81 (1865). "An essential element of jurisdiction is standing . . . ." *Glaze v. State*, 909 N.W.2d 322, 325 (Minn. 2018) (citing *In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn. 2011)). We review the existence of standing de novo. *Thompson v. St. Anthony Leased Hous. Assocs. II, LP*, 979 N.W.2d 1, 6 (Minn. 2022).

To have standing, a party must have "a sufficient stake in a justiciable controversy to seek relief from a court," meaning it has "suffered some injury in fact" or "is the beneficiary of some legislative enactment granting standing." *State ex rel. Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn. 1996) (citations omitted) (internal quotation marks omitted). A party has suffered an injury-in-fact when there has been "a concrete and particularized invasion of a legally protected interest." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Taxpayers without a direct or personal injury may still have standing to bring an action to restrain the unlawful use of public funds. *McKee v. Likins*, 261 N.W.2d 566, 570 (Minn. 1977). Associational standing cannot be invoked unless a member of the association has standing. *State ex rel. Humphrey*, 551 N.W.2d at 497–98.

In this case, the Taxpayers' standing argument does not rely on a claim that they have suffered a direct injury from the re-enfranchisement of certain people with felony

district court by concluding that the Taxpayers and their Association lack standing, we do not reach the merits. Consequently, we do not address the legality of the Re-Enfranchisement Act or the issue of intervention.

7

convictions. Instead, they assert standing based on the common law doctrine of taxpayer standing. We conclude that the requirements for taxpayer standing are not met here.

A.

We begin by clarifying the law on taxpayer standing. In 1928, we commented on taxpayer standing in *Oehler v. City of St. Paul*, 219 N.W. 760 (Minn. 1928). In *Oehler*, taxpayers sued to prevent a person from holding a civil service position and from being paid by the city, alleging that his appointment was unlawful. *Id.* at 761. We held that the taxpayers had standing pursuant to a specific Saint Paul ordinance, *id.* at 763, and then went on to note:

> Without the charter provisions, it is well settled that a taxpayer may, when the situation warrants, maintain an action to restrain unlawful disbursements of public moneys; to recover for the use of the public subdivision entitled thereto money that has been illegally disbursed, as well as *to restrain illegal action on the part of public officials.*

*Id.* (emphasis added).

The Taxpayers' standing argument relies, in part, on a claim that implementation of the Re-Enfranchisement Act requires "illegal action on the part of public officials." *See id.* But our comments regarding taxpayer standing in *Oehler* are plainly obiter dicta. *See Wandersee v. Brellenthin Chevrolet Co.*, 102 N.W.2d 514, 520 (Minn. 1960) ("Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication." (citation omitted) (internal quotation marks omitted)). Since a Saint Paul ordinance explicitly provided the plaintiffs in *Oehler* standing, the discussion of taxpayer standing was not necessarily involved in or essential to our

8

determination of the case. Consequently, the "illegal action on the part of public officials" language in *Oehler* is not binding precedent. *See State v. Atwood*, 925 N.W.2d 626, 629 (Minn. 2019) ("We are bound to our prior statements or rulings on an issue *only* when the statement or ruling was necessary to the decision in the case" (emphasis added)).

Soon after *Oehler*, we held that taxpayers "have a substantial interest in the honest expenditure of the funds into which their taxes are paid." *Regan v. Babcock*, 247 N.W. 12, 16 (Minn. 1933) (holding that taxpayers who paid automobile license fees and state gasoline tax had standing to sue to stop payment of such funds on highway construction contracts). Notably, in *Regan*, we did not cite *Oehler*, much less adopt its "illegal action on the part of public officials" language.

Forty-four years later, we revisited the issue of taxpayer standing in *McKee*, 261 N.W.2d at 566. The plaintiff in *McKee* challenged the authority of state and county welfare officials *to make welfare payments* for medical expenses connected with abortions. *Id.* at 568. We held that the plaintiff had standing to bring his suit as a taxpayer, acknowledging that "it generally has been recognized that a state or local taxpayer has sufficient interest to challenge *illegal expenditures*." *Id.* at 570 (emphasis added). We further stated:

> [W]hile the activities of governmental agencies engaged in public service ought not to be hindered merely because a citizen does not agree with the policy or discretion of those charged with the responsibility of executing the law, the right of a taxpayer to maintain an action in the courts *to restrain the unlawful use of public funds* cannot be denied.

*Id.* at 571 (emphasis added). Although the issue presented in *McKee* focused exclusively on an alleged flaw in the process used to create a bulletin that authorized the *expenditure*

9

*of public funds* for abortions, it is true that during our general discussion of taxpayer standing we quoted the "illegal action on the part of public officials" dicta in *Oehler*. *McKee*, 261 N.W.2d at 571 (quoting *Oehler*, 219 N.W. at 763). But immediately following the dicta, we wrote: "More recently, this court stated that 'it has been generally recognized that a taxpayer has sufficient interest to enjoin illegal expenditures of both municipal and state funds.' " *Id.* at 571 (citing *Arens v. Village of Rogers*, 61 N.W.2d 508, 513 (1953)).

Although our opinion in *McKee* quotes the *Oehler* dicta in passing, the dicta was not necessarily involved or essential to our determination of the issue presented in *McKee*. The issue in *McKee* clearly involved an alleged flaw in the process used to create a bulletin that *authorized the expenditure* of public funds for abortion, 261 N.W.2d at 568, *not* a generalized claim of "illegal action[s] on the part of public officials." *Oehler*, 219 N.W. at 763. Further, in *McKee*, after citing the dicta in *Oehler*, we immediately cited to *Arens*, 61 N.W.2d at 513, for the proposition that "it has been generally recognized that a taxpayer has sufficient interest to enjoin *illegal expenditures* of both municipal and state funds." *McKee*, 261 N.W.2d at 571 (emphasis added) (internal quotation marks omitted). Our reliance on *Arens*, which recognized taxpayer standing in instances where the use of public funds is disputed, supports the conclusion that our binding precedent on taxpayer standing is currently limited to issues of illegal expenditures.

This conclusion is reinforced by the only case in which we have addressed taxpayer standing since *McKee*: *In re Sandy Pappas Senate Committee*, 488 N.W.2d 795 (Minn. 1992). There, the plaintiff attempted to assert taxpayer standing where a candidate allegedly received public funds to which she was not entitled because of a board's

10

interpretation of a statute's spending limits. *Id.* at 796–98. We held that the plaintiff did not have taxpayer standing, in part because the plaintiff's "source of disagreement [did] not lie with the promulgation of rules making possible the allocation of tax revenue to a campaign subsidy fund or with the *actual allocation of such funds*." *Id.* at 798 (emphasis added). To support our holding in *Sandy Pappas*, we cited to the section of *McKee* that summarized our holding in *Arens*—which emphasized the need to challenge expenditures of public funds—not *Oehler*. *Sandy Pappas*, 488 N.W.2d at 798 (citing *McKee*, 261 N.W.2d at 571).

In sum, our discussion of taxpayer standing in *Oehler* is nonbinding dicta, we have not adopted that dicta in subsequent cases on taxpayer standing, and we have never found taxpayer standing solely on the grounds of restraining illegal action. Today, we clarify that taxpayer standing does not exist when a taxpayer simply seeks to generally restrain "illegal action[s] on the part of public officials."[3] Instead, we recognize taxpayer standing only when the central dispute involves alleged unlawful disbursements of public funds.

### B.

Here, the subject of the Taxpayers' challenge is the Re-Enfranchisement Act, codified at Minnesota Statutes section 201.014, subdivision 2a, which focuses on restoring certain individuals' right to vote and does not contemplate government expenditures. As a result, the Taxpayers' concerns regarding the disbursement of certain public funds are incidental to the petition for quo warranto or declaratory judgment.

---

[3] To the extent that *Oehler* or *McKee* suggest otherwise, they are overruled.

11

When we have recognized taxpayer standing, allegations of unlawful expenditures of public funds were central, rather than incidental, to the action. *See, e.g.*, *Regan*, 247 N.W. at 16; *Arens*, 61 N.W.2d at 514; *McKee*, 261 N.W.2d at 568. For example, in *McKee*, the taxpayers directly challenged welfare payments, which their tax dollars supported, for medical expenses connected with abortions. 261 N.W.2d at 568. Without the welfare payments for abortion-related medical expenses, the taxpayers would have had no government action to challenge. But here, the challenged expenditures are incidental to the statute granting certain individuals with felonies the right to vote; Minnesota Statutes section 201.014, subdivision 2a, is enforceable without the Legislature appropriating any money to educate individuals about changes in who is eligible to vote.

We share the district court's concern that granting taxpayer standing in this case "would render the very concept of taxpayer standing meaningless" because "practically every law entails at least *some* public expenditure." We can discern no principled limitation to the theory of taxpayer standing advanced by the Taxpayers that would prevent the concept of taxpayer standing from becoming meaningless by allowing parties to challenge substantive government acts that involve incidental expenditures. We instead hold that when standing would not otherwise exist to challenge a substantive law, a taxpayer cannot manufacture standing by pointing to expenditures that are incidental to implementing the law. For the reasons stated above, we conclude that the Taxpayers lack standing.

## C.

Because we conclude that the Taxpayers do not have standing, it logically follows that their association, Minnesota Voters Alliance, does not have associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (acknowledging that an organization may have standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"); *see also State ex rel. Humphrey*, 551 N.W.2d at (deriving this court's approach to associational standing from *Hunt*).

*       *       *

Because the Taxpayers and their Association lack standing, the district court did not commit reversible error when it denied their petition for a writ of quo warranto or declaratory judgment.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.


HENNESY, GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.

13