MINNESOTA MEDICAL ASSOCIATION, et al., Appellants,

v.

STATE of Minnesota, Minnesota Department of Public Welfare, etc., and Its Commissioner, Respondents,

Minnesota Department of Administration and Its Commissioner, Respondents,

Catholic Bulletin Publishing Co., et al., intervenors, Respondents.

No. 48461.

Supreme Court of Minnesota.

Nov. 24, 1978.

Dorsey, Windhorst, Hannaford, Whitney & Halladay and John M. Mason and Margery K. Otto, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., Barbara D. Gill, Sp. Asst. Atty. Gen., Dept. of Public Welfare, St. Paul, for respondent Dept. of Public Welfare et al.

Warren Spannaus, Atty. Gen., Sheila S. Fishman, Sp. Asst. Atty. Gen., Dept. of Administration, St. Paul, for respondent Dept. of Admin. et al.

Rothenberg & Hirl, Minneapolis, D. D. Wozniak, St. Paul, for respondent Catholic Bulletin.

Minnesota Civil Liberties Union, Minneapolis, Susan L. Lentz, Minneapolis, Minn. Broadcasters Assn., Peterson, Popovich, Knutson & Flynn, St. Paul, amicus curiae.

SHERAN, Chief Justice.

This is an appeal from an order of the Ramsey County District Court denying plaintiffs' motion for a temporary injunction restraining defendant Minnesota Department of Public Welfare from furnishing to the Catholic Bulletin Publishing Co. any data relating to the names of service providers, description of medical procedures, and amounts paid to service providers relating to abortions in 1976 and 1977. We affirm.

In June 1977, a Catholic Bulletin reporter requested the Department of Public Welfare to provide him a list of all physicians, clinics, and hospitals that had performed abortions for medical assistance patients in 1976 and 1977 and to disclose the amounts the state had paid each service provider for these procedures. The department agreed to provide the information, which is stored with other data furnished by the providers on computer tapes.[1] The department informed the Bulletin that it would cost $2,500 to $4,000 to program and run the computer to retrieve the data, but later agreed to furnish it at no cost if the Bulletin would prepare the program.

At that time the Minnesota Medical Association and its president, Dr. Chester Anderson, brought an action for a temporary and permanent injunction to prohibit the department from disseminating information stored in state computers until administrative regulations governing access to computer-stored information were adopted and complied with, which regulations should require payment of retrieval costs, public hearings prior to dissemination, and protection of patients' and physicians' rights to receive and render medical treatment. On November 23, 1977, a temporary restraining order and order to show cause was issued. On December 14, 1977, a hearing was held on plaintiffs' motion for a temporary injunction—

"* * * restraining and enjoining Defendants, their officers, agents and employees and all persons acting in concert or participation with them from publishing, providing, disseminating or otherwise disclosing data in response to the request of the Catholic Bulletin that it be provided without cost and by use of its own computer program, any data relating to names of service providers and/or medical procedures and amount paid to service providers relating to 'abortions' during 1976 and 1977, including any portions or part thereof, and whether alone or in combination, until the final adjudication of Plaintiffs' claims for relief."

On December 20, 1977, the court issued its order denying the motion. It concluded that, with the exception of Dr. Chester Anderson's claim that providing the information to the Catholic Bulletin without cost would constitute an unlawful expenditure of public funds, the plaintiffs had "no constitutional or statutory right to the relief sought." It held that the information sought was "public" enjoying no classification of "private" or "confidential" under Minn.St. 15.1642, and that the fact that the information was stored on computer tapes does not remove it from the category of "public records" under Minn.St. 15.17. It further held that prohibiting disclosure would impose an unconstitutional prior restraint on publication by the Catholic Bulletin. With respect to Anderson's claim as a taxpayer, the court held that the Catholic Bulletin must pay the cost of providing the data. It ruled, however, that a claim that the department would not charge the full cost was not a ground for injunctive relief since the taxpayer could challenge the rea-

---

1. To receive payment for services to medical assistance patients, the hospital, clinic, or physician must submit a "Practitioner Invoice" containing information about the patient and the service performed. The invoices are then microfilmed, and the originals are destroyed. The microfilm copies are read by a machine which records the data on master computer tapes. Both the microfilm copies and the tapes are retained by the department. Retrieving the data from the computer rather than allowing access to the microfilm copies protects the confidentiality of the patients since only the specific information sought need be disclosed.

sonableness of the department's charges in a taxpayer suit to recover the sum allegedly due.

Plaintiffs appeal, contending that they have standing to challenge alleged invasions of their right to administer medical treatment;[2] that the use of the state's computers to compile, collate, and correlate the requested data will impair or defeat privacy rights, physicians' rights to administer medical treatment according to their professional judgment, and medical assistance patients' right to a free choice of physicians; that state agencies must adopt rules governing access to computer files before releasing any information stored therein; and that taxpayers may obtain injunctions prohibiting agencies from furnishing services or property until full payment is received.[3]

■ The issue on appeal from an order denying a motion for a temporary injunction is whether the lower court abused its discretion. *Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 137 N.W.2d 314 (1965). In this case, where the lower court determined that the plaintiffs have no right to the relief sought, we confine our review to an examination of this dispositive issue. Appellants claim both statutory and constitutional rights to prevent the requested disclosure. They contend that disclosure is not permitted under the Data Privacy Act and that disclosure would infringe medical assistance patients' right under Minn.St. 256B.01 to free choice of a physician. They and amicus Minnesota Civil Liberties Union also contend that disclosure would infringe

physicians' privacy and property rights and medical assistance patients' privacy rights. We find these contentions to be without merit.

## I. STATUTORY BASES FOR INJUNCTIVE RELIEF

### A. Statutory Classification of the Requested Data

The purpose of Minn.St. 15.162 to 15.169, known as the Minnesota Data Privacy Act, is to control the state's collection, security, and dissemination of information in order "to protect the privacy of individuals while meeting the legitimate needs of government and society for information." Minn.St. 15.169, subd. 3(3). To accomplish this purpose the law provides for the classification of data on individuals into three categories: "confidential," "private," and "public."

"Confidential data on individuals" is defined as data which is "(a) made not public by statute or federal law applicable to the data and is inaccessible to the individual subject of that data * * *." Minn.St. 15.162, subd. 2a.

"Private data on individuals" is data "which is made by statute or federal law applicable to the data: (a) not public; and (b) accessible to the individual subject of that data." Minn.St. 15.162, subd. 5a.

"Public data on individuals" means "data which is accessible to the public in accordance with the provisions of section 15.17." Minn.St. 15.162, subd. 5b.

---

**2.** The district court's conclusion that plaintiffs have "no constitutional or statutory right to the relief sought" is not clearly a ruling with respect to their standing. Rather, it may be interpreted as a decision on the merits of the claims, and we adopt this interpretation. As the United States Supreme Court held in *Singleton v. Wulff*, 428 U.S. 106, 118, 96 S.Ct. 2868, 2876, 49 L.Ed.2d 826, 835 (1976), "* * * it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." Similarly, the medical association is an appropriate party to represent the claims of its individual members. "To require that [the right to remain anonymous] be claimed by the members themselves

would result in nullification of the right at the very moment of its assertion." *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488, 1498 (1958).

**3.** Because the court below ordered the department to assess the full cost of providing the requested information and nothing in the record indicates that the department will not do so, Dr. Anderson's taxpayer claim has been resolved in his favor. Having been granted appropriate relief, he is not in a position to raise this issue on appeal. *Twin Cities Metropolitan Public Transit Area v. Holter*, 311 Minn. 423, 249 N.W.2d 458 (1977).

These definitions require that classifications as "confidential" or "private" be made by "statute or federal law applicable to the data."[4]

■ Appellant cites no statute or federal law which makes the names of those receiving payments for abortion services provided to medical assistance patients or the amount of the payments received "not public."[5] Therefore, this information is neither "confidential" nor "private." Appellants nevertheless contend that the information is not "public data on individuals" because it does not fall within the definition of "public records" under Minn.St. 15.17.

Minn.St. 15.17, subd. 1, requires all state agencies to "make and keep all records necessary to a full and accurate knowledge of their official activities." The statute then provides that "[a]ll such public records" shall be made on durable paper, but that they may be photographed, photostated, microphotographed, or microfilmed and that the reproductions may be substituted for the originals. Minn.St. 15.17, subd. 4, requires public record custodians to keep the records "easily accessible for convenient use," and provides in part:

"* * * Except as otherwise expressly provided by law, he shall permit all public records in his custody to be inspected, examined, abstracted, or copied at reasonable times and under his supervision and regulation by any person; and he shall, upon the demand of any person, furnish certified copies thereof on payment in advance of fees not to exceed the fees prescribed by law."

Appellants contend that, because the information sought here was stored on computer tapes, it is not a "public record" accessible to the public under § 15.17. Rather, they argue, only the microfilm copies of the practitioner invoices from which the computer tapes are made constitute public records. This argument is without merit.

■ The requirement of Minn.St. 15.-17, subd. 1, that public records be made on durable quality paper does not constitute a definition of public records. Rather, that requirement is imposed on "[a]ll *such* public records." "Such" refers to the sentence immediately preceding, which requires officials to keep "all records necessary to a full and accurate knowledge of their official activities." Thus, whether records are "public records" depends not on the form in which they are kept but on whether they are "necessary to a full and accurate knowledge" of official activities. The form requirements merely ensure that the records are made permanent. The department has complied with this provision by microfilming the practitioner invoices.

---

4. Minn.St. 15.1642 provides an emergency classification procedure by which an office of official responsible for the collection and use of a set of data can apply to the commissioner of the department of administration to temporarily classify data as "confidential" or "private" "until a proposed statute can be acted upon by the legislature." *The commissioner's determination is subject to the approval of the attorney general.* No such emergency classification was made with respect to the data involved in this case.

5. Minn.St. 256B.27 might be read as an indication that the legislature intended such information to be public. That provision authorizes the commissioner of public welfare to require "any reports, information, and audits of medical vendors which he deems necessary" and requires that: "[a]ll reports as to the costs of operations or of medical care provided which are submitted by vendors of medical care for use in determining their rates or reimburse-

ment shall be submitted under oath as to the truthfulness of their contents by the vendor or an officer or authorized representative of the vendor." It also requires that the commissioner be afforded access to all medical records of medical assistance patients for the purpose of investigating whether care reported by a vendor was *actually* provided and was necessary. The final subdivision of the statute classifies the *medical records* as private data under Minn.St. 15.162, subd. 5a. The fact that the vendors' reports were not so classified evidences a legislative intent that they be deemed "public data."

A similar inference can be drawn from Minn.St. 145.413, which requires physicians to report to the state board of health all abortions they perform. The statute expressly provides that no part of such reports may be disclosed and classifies as "confidential" all information reported.

Minn.St. 15.17, subd. 4, which grants public access to all public records, "except as otherwise expressly provided by law," places no restrictions on the form in which the records shall be made available other than that they shall be "easily accessible for convenient use." While it provides that "[p]hotographic, photostatic, microphotographic, or microfilmed records shall be considered as accessible for convenient use regardless of the size of such records," it does not proscribe furnishing the records in some other form acceptable to the requester. Therefore, Minn.St. 15.17 does not in any way prohibit the department from releasing data contained in its public records in the form of a computer printout.

■ Minn.St. 256B.041 provides for the establishment of a system for the centralized disbursement of medical assistance payments to vendors by the commissioner of public welfare. Minn.St. 256B.064 provides for the termination of such payments to vendors of medical care who have been determined to be ineligible for payment. These provisions establish that the records of payments to individual providers of medical care are "necessary to a full and accurate knowledge" of the department's official activities. Without such records it could not be determined whether the department was making payments only to eligible providers or whether the payments made were reasonable for the services provided. Therefore, such records are public records accessible to the public under Minn.St. 15.17, and the information contained in such records is "public data on individuals" under Minn.St. 15.162, subd. 5b.

### B. Patients' Right to Free Choice of Physician

Appellants argue that even if the disclosure of the information sought is not proscribed by statute, such disclosure would impair or defeat the statutory right of medical assistance patients to a free choice of physicians. They contend that, if the information is disclosed, fewer doctors will be willing to participate in the medical assistance program and the patients' right to free choice will thereby be impaired. Even if this is true, however, it does not serve as a ground for injunctive relief.

The legislature has provided mechanisms by which the public may be denied access to information controlled by state agencies. It has further determined that public records are to be available to the public "except as otherwise expressly provided by law." Minn.St. 15.17, subd. 4. These provisions evidence a legislative intent to retain full control of public access to information. The power to restrict access is given to administrative agencies only in emergency situations, and even that power is subject to legislative action. No power to restrict access is granted to the courts.

■ With such a clear statement of legislative intent, appellants' contention that the court should balance the public's statutory right of access against medical assistance patients' statutory right to a free choice of physicians and the effectiveness of the medical assistance program is unacceptable. The legislature has expressly reserved the power to engage in such balancing to itself, and its failure to deny public access to the information sought here constitutes a legislative determination that the public's right to know outweighs the competing interests of the medical assistance program and its patients.

### C. Necessity for Rules and Regulations Governing Access to Computer-Stored Data

Minn.St. 15.1641(e) provides:

"The responsible authority shall establish procedures and safeguards to ensure that all public, private or confidential data on individuals is accurate, complete and current. Emphasis shall be placed on the data security requirements of computerized files containing private or confidential data on individuals which are accessible directly via telecommunications technology, including security during transmission."

Minn.St. 15.1671 provides in part:

"The commissioner [of administration] shall with the advice of the intergovernmental information services advisory

council promulgate rules, in accordance with the rulemaking procedures in the administrative procedures act which shall apply to state agencies, statewide systems and political subdivisions to implement the enforcement and administration of sections 15.162 to 15.169."

Appellants argue that since no rules have been adopted as required by § 15.1671, no information stored in the department's computer may be compiled or disseminated to the public. Appellants base their argument on the broad legal principle that important questions of social and political policy should not be decided by administrative agencies on an *ad hoc* basis. Yet, they fail to relate this principle to the facts of this case.

Minn.St. 15.1641(e), quoted above, does not expressly require agencies to implement computer security procedures through rulemaking. The definition of "rule" in Minn.St. 15.0411, subd. 3, of the Administrative Procedures Act specifically excludes "rules concerning only the internal management of the agency or other agencies, and which do not directly affect the rights of or procedure available to the public." The "procedures and safeguards" to ensure the accuracy, completeness, and currency of agency data on individuals concern only the internal management of the agency since they provide guidance to the agency in its collection and storage of information. Therefore, such procedures and safeguards need not be adopted in the manner specified by the Administrative Procedures Act.

▮ Minn.St. 15.1671 requires the commissioner of administration to adopt, in accordance with the Administrative Procedures Act, rules "to implement the enforcement and administration of sections 15.162 to 15.169." The commissioner has not done so. Nevertheless, this failure cannot affect public access to "public" information. Nothing in sections 15.162 to 15.169 purports to govern dissemination of public data. Dissemination is governed by Minn.St. 15.17 to 15.174. Minn.St. 15.171 expressly authorizes the use of "alternative methods for the compilation, maintenance

and storage of information contained in [official] records" and provides that such methods must provide for access to the information "by those authorized by law to have access." Since the information sought here is public information, the Catholic Bulletin is authorized to have access to it. Its access is thus determined under the Official Records Act, and the commissioner's failure to promulgate rules under the Data Privacy Act is immaterial. See, *Reyburn v. Minnesota State Board of Optometry*, 247 Minn. 520, 527, 78 N.W.2d 351, 356 (1956).

Because the information sought by the Catholic Bulletin is "public data on individuals" accessible under the Official Records Act, because the statutory right of medical assistance patients has been legislatively subjected to the public's right to information contained in official records, and because the failure of the commissioner of administration to adopt rules under the Data Privacy Act does not affect the public's right to information, appellants have no statutory right to prevent the department from disclosing the requested information.

## II. CONSTITUTIONAL GROUNDS FOR INJUNCTIVE RELIEF

Appellants assert that "collection and disclosure of data relating to abortions is constitutionally suspect, and may be sustained only upon a showing that it will be held in confidence and that it will not restrict the physicians' right to exercise of medical judgment or otherwise interfere with a pregnant woman's right to obtain an abortion prior to viability of the embryo." This statement is overly broad and does not correctly state the holding of the court's decision in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). The amicus brief of the Minnesota Civil Liberties Union provides a better statement of the constitutional issues. The M.C.L.U. contends that disclosure of the names of physicians who performed abortions on medical assistance patients would infringe the privacy rights of both the patients and the physicians.

## A. Patients' Right to Privacy

In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the court held that a woman has a right of personal privacy that encompasses the decision whether or not to terminate her pregnancy. This right is not absolute, but is subject to the states' compelling interests in the protection of maternal health, medical standards, and prenatal life. The states' interests in maternal health, however, do not become "compelling" until the second trimester, and their interests in prenatal life do not become compelling until the fetus is viable. Thus, a state may not interfere with the patients' and physicians' decision to abort during the first trimester and, during the second trimester, may regulate abortions only in ways reasonably related to the health of the mother. 410 U.S. 164, 93 S.Ct. 732, 35 L.Ed.2d 183.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the court upheld a provision of a Missouri statute that required doctors to make and keep records on all abortions for the use of local, state, and national public health officers. The records were to be confidential and used only for statistical purposes to enhance medical knowledge for the preservation of maternal health. The recordkeeping requirement was challenged on the ground that it constituted an unconstitutional restriction on the patients' abortion decision during the first trimester. The court, however, found that the records served the state's interest in protecting the health of its female citizens and that, because the records were confidential, there was "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship." 428 U.S. 81, 96 S.Ct. 2846, 49 L.Ed.2d 812.

Amicus M.C.L.U. contends that the proposed disclosure of the names of physicians who performed abortions will have the legally significant impact not found in *Danforth*. First, there is the danger that patients' names will be accidentally disclosed. Second, any disclosure will have a chilling effect in that women may be prevented from obtaining an abortion by the fear that their names might be accidentally disclosed. Third, a woman may be deterred from seeking an abortion from the doctor named because people might correctly infer the reason she saw that doctor. Fourth, disclosure may cause some doctors to discontinue performing abortions, thus making it more difficult for women to find a willing doctor and infringing their freedom of choice in the selection of a physician. M.C.L.U. also notes that the confidentiality of the physician-patient relationship is protected under state law.

 Nevertheless, the M.C.L.U.'s speculations on the possible effects of the disclosure of the doctors' names on women seeking abortions are not sufficient grounds for injunctive relief. Whenever the state acquires confidential information, the possibility of accidental disclosure exists. That possibility is not sufficient to preclude the state from acquiring the information, *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and should also not be sufficient to deprive the public of access to other, nonconfidential information. Beyond simply presenting the possibility of accidental disclosure of patients' names, amicus offers nothing to show that the procedures followed by the department in this case are insufficient to protect patient anonymity. Similarly there is no evidence to support the speculation that the mere possibility of disclosure of patient identities, however slight, will be a significant factor in a medical assistance patient's decision not to seek an abortion.

The guilt-by-association argument is also without evidentiary support and appears even less reasonable. The validity of that argument must rest on the assumption that once a doctor is known to have performed abortions, it may be inferred that all, or at least the majority, of his female patients employ him to perform abortions. Only if the doctor provides almost no services except abortions, does such an assumption have merit. In such a case, it is likely that the nature of the doctor's practice would be

known even without disclosure of the department's information. Thus, it is improbable that disclosure will have any significant effect on the inferences that can be drawn from the fact that a woman visits a particular physician.

A "radical restriction in the number of Minnesota physicians willing to perform abortions" resulting from disclosure would present a more difficult problem than the more direct effect on women themselves. Amicus contends that such a reduction would infringe on a woman's right to make an independent abortion decision by making abortions less available. Here again, however, there is no evidence that such a reduction will occur.

Robert G. Randle, director of the Medical assistance division of the state Medicaid program, states in his deposition that disclosure of physicians' names "could have some kind of an impact on participation" of medical providers in the medical assistance program. He goes on to state, however, that his "primary concern was the relationship between the providers and the program." Nowhere does he forecast a "radical restriction" in the number of participating providers.

The affidavit of plaintiff Dr. Chester Anderson states that disclosure of the names of physicians and the nature of the treatments they provided "would also discourage physicians and other medical providers from providing treatment covered by the Medical Assistance program to patients eligible for Medical Assistance and discourage physicians and other medical providers from performing necessary medical procedures which are controversial from a nonmedical point of view." He does not allege any significant reduction in the number of doctors willing to participate in the medical assistance program. Neither Randle nor Anderson offers any support for his speculations.

Moreover, it seems unlikely that mere disclosure of the fact that a doctor has performed abortions will cause him to stop providing that service. Once that fact is known, the doctor has little reason to stop.

In fact, disclosure could aid women seeking abortions to find a doctor willing to provide the service.

Of course, disclosure may also permit those who oppose abortions to focus pressure on the named doctors to convince them that it would be in their best interests to cease providing the service. The propriety of such action, however, is not before this court, which is concerned on this appeal only with the effect of the disclosure itself.

The United States Supreme Court has indicated that any state action that interferes with a woman's right to make an independent abortion decision or with her physician's exercise of medical judgment constitutes an invasion of her right to privacy, at least during the first trimester of pregnancy. See, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 81, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788, 812, where the court stated:

"* * * We naturally assume, furthermore, that these recordkeeping and record-maintaining provisions will be interpreted and enforced by Missouri's Division of Health in the light of our decision with respect to the Act's other provisions, and that, of course, *they will not be utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction.*" (Italics supplied.)

The disclosure sought to be prevented in this case would not constitute such an "otherwise unconstitutional restriction." Disclosure places no burden on the doctor, does not destroy the confidentiality of his relationship with patients, and does not restrict his freedom to exercise his medical judgment. Disclosure itself does not have any effect on the moral or ethical considerations that affect his decision whether or not to perform abortions. If antiabortion factions of the public convince him to stop performing abortions, his decision will be the result of private, not state, actions. Therefore, even if the ultimate consequence of disclosure is a reduction in the number of physicians willing to perform abortions, that re-

duction will not constitute an unconstitutional infringement of women's rights of privacy.

Plaintiffs thus have failed to establish that failure to grant the requested injunction will result in a deprivation of female medical assistance patients' rights to privacy in making an independent decision to seek termination of pregnancy.

### B. Physicians' Right to Privacy

Amicus M.C.L.U. asserts that disclosure will deprive physicians of their rights to both privacy and property. The property right claimed is "to practice medicine according to his or her best judgment and without undue interference by the state." Whether physicians have the property right claimed, independent of their patients' rights to receive the services involved, has not been decided. *Singleton v. Wulff*, 428 U.S. 106, 113, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826, 833 (1976). Even if such a right exists, as is noted in the preceding section, disclosure itself does not constitute "interference" by the state. Thus, the physician's right to privacy is the only right not derived from the patients that can serve as a ground for injunctive relief.

In *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176 (1973), the court stated:

"The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. * * These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy."

Thus, the question presented by the assertion of the physicians' right of privacy is whether the personal right claimed—that is,

the right of medical assistance providers to keep the details of their dealings with the department of public welfare from becoming public knowledge—is "fundamental" or "implicit in the concept of ordered liberty."

The right claimed is not, as amicus argues, "the right not to have all their professional and business dealings made public." The department does not propose to disclose "all their professional and business dealings." Only services that are paid for with public funds are involved. The providers contracted with the department to provide medical care to medical assistance patients and were paid by the department for services rendered pursuant to the agreement. The intervenors seek disclosure of information concerning only those services and payments.

Viewed in this manner, the contention that disclosure would infringe the physicians' personal rights of privacy loses much of its force. The public has a right to know about the workings of government. The United States Supreme Court stated in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328, 347 (1975):

"* * * [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally."

In opposition to the public's need for information in this case is the doctors' asserted right to prevent public disclosure of their names. In *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405, 421 (1976), the court held that no personal right

of privacy was infringed when a police department distributed a flyer identifying the plaintiff as an "Active Shoplifter" to local businesses. The court stated:

" * * * In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty' as described in *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

"Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be 'private,' but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner."

The instant case, like *Paul v. Davis*, involves the disclosure of records of official acts. As previously noted, that disclosure does not restrict the doctors' freedom of action in a private sphere. Moreover, the information to be disclosed cannot be characterized as purely "personal" since it concerns the expenditure of public funds. In *Nixon v. Administrator of General Services*, 433 U.S. 425, 459, 97 S.Ct. 2777, 2798, 53 L.Ed.2d 867, 901 (1977), the court distinguished between the former president's personal matters "for example, 'extremely private communications between him and, among others, his wife, his daughters, his physician, lawyer and clergyman, and his close friends as well as personal diary dictabelts and his wife's personal files.' 408

F.Supp., at 359." and matters relating to acts done in his public capacity. The same distinction can be made between a doctor's private records and the records of the department of public welfare's payments to him. The latter records are not "extremely private communications." It must, therefore, be concluded that disclosure of the information sought here will not infringe physicians' constitutional rights of privacy.

Appellants have failed to establish that they have any statutory or constitutional right to prevent disclosure of the requested information. Since disclosure will not violate appellants' rights, the district court did not abuse its discretion in denying their plea for injunctive relief and its decision is affirmed.

Affirmed.

OTIS, Justice (dissenting).

There are two areas of disagreement with the majority opinion which prompt me to dissent. They are, however, fundamental to the ultimate disposition of these proceedings. First, I have no trouble reconciling the Data Privacy Act with the Official Records Act insofar as they deal with the protection of a needy patient's privacy. In my opinion, they compel compliance with the statutory mandate that the commissioner of administration adopt appropriate regulations to implement the Data Privacy Act. Such regulations can distinguish private detail from otherwise public Medicaid payment records. Second, the disclosure here sought, I submit, constitutes state action which results in a constitutional burden on the right of needy patients to obtain abortions.

1. The Need for Regulations.

To recapitulate the background of these proceedings, the Catholic Bulletin Publishing Company and the Minnesota Newspaper Association have intervened in an action to restrain the Department of Public Welfare and the Department of Administration from disclosing the names of doctors who in 1976 and 1977 furnished medical procedures

to needy persons seeking abortions funded by the state and federal government under Medicaid, as described in the foregoing opinion "service providers" such as hospitals, clinics, and physicians furnish the department with invoices describing the patient and the service performed. Those invoices are microfilmed and the microfilm copies are transferred to master computer tapes. The data is retrieved from the computer for authorized purposes.

Since public funds are being expended, it is not only appropriate but necessary that any interested member of the public, upon request, be provided with information concerning the identity of doctors who are being paid out of state funds, the type of service rendered such as surgical, medical, or psychiatric, the time devoted to those procedures, and the amount paid the doctor, clinic, or hospital making the claim. The legitimate inquiry is whether the fee charge was reasonable in light of the services performed. Beyond that, however, the particular kind of surgery is not so relevant to the amounts charged as to outweigh the serious consequences which flow from identifying a particular procedure such as abortion with a particular doctor. In short, there is no apparent reason why the public should not have unfettered access to all information *except* as it describes a procedure as an abortion.

In areas as sensitive as this, it seems obvious to me that regulations to guarantee the privacy of such medical detail are mandated. The statutes everywhere reflect the policy that an individual's medical record, including an abortion, is confidential. Minn.St. 145.413, subd. 1, a public health law, requires the State Board of Health to promulgate regulations to effect a reporting system on abortions with this admonition:

"* * * No such report, or any part thereof, shall be disclosed, in any manner, by any official or clerk or other employee or person having access thereto, and all such information shall be confidential."

Under Minn.St. 256B.04, subd. 2, a medical assistance statute, the commissioner of public welfare is directed to—

"[m]ake uniform rules and regulations, not inconsistent with law, for carrying out and enforcing the provisions hereof in an efficient, economical, and impartial manner."

Subdivision 7 goes on to state that the commissioner shall—

"[e]stablish and enforce safeguards to prevent unauthorized disclosure or improper use of the information contained in applications, reports of investigations and medical examinations, and correspondence in the individual case records of recipients of medical assistance."

The Data Privacy Act directly relates to such individual records and by its term states in Minn.St. 15.1641:

"(c) Private or confidential data on individuals shall not be used, collected, stored or disseminated for any purposes other than those stated to an individual at the time of collection * * *."

unless the purpose is approved by the commissioner, subsequently authorized by state or federal legislature, or the individual has given informed consent.

Subsection (e) directs that—

"[t]he responsible authority shall establish procedures and safeguards to ensure that all public, private or confidential data on individuals is accurate, complete and current. Emphasis shall be placed on the data security requirements of computerized files containing private or confidential data on individuals which are accessible directly via telecommunications technology, including security during transmission."

Minn.St. 15.1671 further requires the commissioner of administration to promulgate rules in accordance with the notice and hearing procedures in the Administrative Procedure Act.

The majority looks to a rulemaking provision in the Act, Minn.St. 15.0411, subd. 3, as authority for excluding the necessity for the notice and hearing in regulations establishing procedures and safeguards for disseminating information because, as a mat-

ter of law, the Data Privacy Act's requirement for establishing such safeguards deals only with internal management. The majority further holds that the information requested in this case is public and that notice and hearing regulations implementing the Data Privacy Act therefore would be immaterial. That conclusion, I submit, flies in the face of all of the policy declarations to the contrary which permeate the statutes referred to above. Abortion information concerning a particular patient is confidential, and the basic purpose of the Data Privacy Act, as indicated above, is to protect confidential data from indiscriminate scrutiny and to insure that all disseminated information is accurate, particularly as it is fed into and read out of computers.

In *McKee v. Likins*, 261 N.W.2d 566 (Minn.1977), we held that the commissioner of public welfare was not authorized to use medical assistance funds for elective nontherapeutic abortions without compliance with the rulemaking provisions of the Minnesota Administrative Procedure Act which required public notice and a hearing. We based our decision on the fact that the question was one of important social and political policy to the public. "If the legislature has placed the issue in the hands of an administrative official that official's decision ought to be based on a careful expression of all interested viewpoints." (261 N.W.2d 578.) For the reasons stated in *McKee*, it is equally important that members of the medical profession, social workers, and other professional and nonprofessional members of the public be given notice and an opportunity to be heard on the question of distinguishing under the Data Privacy Act between generally public records and confidential details in those records, to arrive at regulations which will make public records easily available and prevent confidential records from reaching those who are not entitled to examine them. I cannot agree with the majority that the mere fact some data is public should foreclose the necessity for protecting data which is not. In *McKee* we were quick to find a duty on the part of the commissioner to adopt regulations in accordance with the rulemaking procedures and directed that she do so. Here, where this responsibility is conceded to be statutorily mandated, I submit we should be equally diligent in requiring the commissioner to perform that duty.

## 2. The Effect of Disclosure on the Rights of Patients.

The majority holds that because the legislature has failed to deny public access, the commissioner of public welfare is required under the Official Records Act to disclose not only what abortion services are rendered to needy patients but the names of the doctors and other providers who perform those medical procedures. One reason given for this conclusion is that the legislature has evinced an intention "to retain full control of public access to information" by specifically excluding some information, and that "[n]o power to restrict access is granted to the courts." The majority then finds it unacceptable to balance the patient's rights against those of the public because of "a legislative determination that the public's right to know outweighs the competing interests of the medical assistance program and its patients." I do not construe this language literally to mean that when the legislature has spoken we have no further responsibility to examine the impact of a statute on fundamental constitutional rights as they have been articulated by the United States Supreme Court. The majority does go on to discuss the effect of disclosure on a woman's right to make an independent abortion decision. It concedes this is a difficult problem but concludes there is no evidence it would reduce the number of physicians willing to perform abortions. In this connection it should be borne in mind there has been no rulemaking hearing, no trial on the merits, and no adequate opportunity to present evidence since this is simply an appeal from an interlocutory order denying a temporary injunction. By the very nature of such proceedings the presentation of evidence is greatly circumscribed. Nevertheless, the failure to grant a temporary injunction may

render the principal issues moot.[1] I cannot agree with my colleagues, therefore, that the appellants had the burden of producing all of the evidence which they would normally make available at a hearing or trial.

The heart of this litigation is the difficult, sensitive, and volatile question of whether disclosing the identity of physicians who perform abortions on needy patients will unconstitutionally make such services unavailable to those who are entitled to utilize them. It would be ingenuous to assume that there was any other purpose for demanding such disclosure. The majority finds that it is unlikely disclosure will cause a doctor to stop performing abortions but concedes that such disclosure "may also permit those who oppose abortions to focus pressure on the named doctors to convince them that it would be in their best interests to cease providing the service. * * * If anti-abortion factions of the public convince him to stop performing abortions, his decision will be the result of private, not state, actions." The court therefore concludes that a reduction in the number of those performing abortions is not an "unconstitutional infringement of women's rights of privacy." With these inferences of fact and conclusions of law, I strongly disagree.

The majority concedes, as it must under *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), that "any state action that interferes with a woman's right to make an independent abortion decision or with her physician's exercise of medical judgment constitutes an invasion of her right to privacy * * *." In *Whalen v. Roe*, 429 U.S. 589, 605, 97 S.Ct. 869, 879, 51 L.Ed.2d 64, 77 (1977), the Supreme Court had this to say on the subject of the dangers of invading privacy by releasing information regarding drug use:

> "* * * The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our armed forces and the enforcement of the criminal laws, all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. *The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures.* Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy." (Italics supplied.)

The court then commented on its prior decision in *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), as follows:

> "The constitutional right vindicated in *Doe* was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion procedures were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the Constitution." (429 U.S. 605, 97 S.Ct. 879, 51 L.Ed.2d 76).

With respect to the question of whether the results of disclosure constitute private action or state action, it is enough to say that without state action there can be no disclosure and without disclosure there will be no private action. The state cannot close its eyes to the inevitably impermissible consequences of what might be in an-

---

1. This precise danger was recognized and averted in *Florida Medical Assn. v. Department of Health, Education, and Welfare*, 454 F.Supp. 326 (M.D.Fla.), which deals with disclosure of amounts paid to physicians under Medicare, but not with any further breakdown of specific procedures such as abortions.

other context a valid constitutional function. But when what is otherwise valid results in an unconstitutional deprivation of a fundamental right, the state is not at liberty to be a party to that activity.

Under the Constitution of the United States, nontherapeutic-elective abortions in the first trimester are valid medical procedures with which the state cannot interfere. For those who can afford them, legal abortions are unrestricted and no reason need be given for performing them. As for needy patients, for whom elective-nontherapeutic abortions are economically out of reach, legal abortions are limited under Medicaid in Minnesota to those which prevent the death of the mother, or where pregnancy results from criminal sexual conduct or is the result of incest.

Those who oppose all abortions have a constitutional right to make their views known vigorously and persistently, by every means of communication available. This is their First Amendment privilege together with the right to assemble and petition as a means of advocating their moral position, and indeed to use any other peaceful method for achieving that purpose. I do not suggest that the Catholic Bulletin intends to do more than appeal editorially to the doctors whose identity is here sought. Unfortunately, however, experience has demonstrated that the voice of reason does not always stay the hand of those who believe their deeply held convictions justify resort to violence.

It is unrealistic to assume that once the names of doctors and clinics who are performing legal abortions for needy patients are disclosed they will not be subject to the same kind of unlawful abuse now experienced by clinics which are openly operated. We need only refer to local and national news media for the answer to the majority's conclusion that the possible effects of disclosure are merely speculative. Within the last two years clinics providing legal abortions have been firebombed or vandalized in Burlington, Vermont; Cleveland, Cincinnati and Columbus, Ohio; St. Paul, Minnesota; Omaha, Nebraska; and Washington, D. C. In a number of other cities clinics have been invaded and disrupted by anti-abortion groups for the purpose of harassing and intimidating staff and employees.

It is not the welfare of the medical profession which is our primary concern but the welfare of needy patients whose constitutional rights are denied unless doctors are available to provide them with the medical assistance to which they are entitled.

I think it regrettable and inappropriate that the state and its courts are insensitive to the legitimate concerns of those women who, because of their youth or economic and cultural deprivation, are least capable of asserting the rights enjoyed by others whose resources are more abundant.

I would reverse and remand with directions to permanently enjoin any disclosure that a particular doctor has performed an abortion on any indigent patient, but otherwise permit the disclosure of the identity of the doctor, the services performed in general terms such as medical, surgical, or psychiatric, and the amount which was received in public funds. In addition, I would direct that the commissioner of administration adopt appropriate regulations to distinguish confidential detail from otherwise public Medicaid payment reports to insure the confidentiality and privacy of needy patients who receive medical assistance.

TODD, Justice (dissenting).

I join in the dissent of Mr. Justice Otis.

WAHL, Justice (dissenting).

I respectfully join in the dissent of Mr. Justice Otis.