317 N.W.2d 705 (1982)
Roma KOUDSI, Respondent,
v.
HENNEPIN COUNTY MEDICAL CENTER, et al., Appellants.
No. 81-560.
Supreme Court of Minnesota.
April 2, 1982.
Rehearing Denied May 12, 1982.
Thomas L. Johnson, County Atty., and George H. Elwell, Sr. Asst. County Atty., Minneapolis, for appellants.
Cox & Goudy and Craig A. Goudy, Minneapolis, for respondent.
Heard, considered, and decided by the court en banc.
PETERSON, Justice.
Hennepin County Medical Center (the hospital) appeals from a judgment of $12,500 *706 and attorney fees awarded to respondent Roma Koudsi for alleged violations of her statutory right to privacy. The central issues on appeal are whether the evidence establishes a violation of respondent's rights under the Patients' Bill of Rights, Minn. Stat. 144.651 (1980), or the Data Privacy Act, Minn.Stat. §§ 15.162  .1671 (1978); and, if so, whether the evidence supports the jury verdict of $12,500 for mental anguish. We hold that no statutory violation occurred and accordingly reverse.
Respondent, a 24-year-old mother of two children, was separated from her husband when she became pregnant by another man in July 1977. Because she was attempting a reconciliation with her husband at the time and did not feel capable of raising three children on her own if the reconciliation failed, she decided to keep her pregnancy confidential and to put the baby up for adoption. Respondent, whose weight was such that her pregnancy was not apparent, was able to take her pregnancy to term without the knowledge of her family. On April 15, 1978, when respondent entered the hospital to give birth, her pregnancy was known only to her sister Carol Ebrahim, in whom she had confided, and employees of the Children's Home Society of St. Paul (the society), who had made preparations for the adoption.
Upon entering the hospital, respondent told some of the labor room nurses and the attending physician of her plan to place her baby for adoption. No request for confidentiality was made to those persons. After delivery of a baby boy, respondent was transferred to the hospital's maternity ward. There she talked to at least one licensed practical nurse and the "head nurses" on the floor. Respondent told the licensed practical nurse that she wanted her presence in the hospital kept confidential. When told that the hospital personnel could not deny her presence, respondent said she "did not want any information given out on it."
Respondent's conversations with the head nurses are not so clearly presented in the record. On cross-examination respondent maintained that she told the head nurse on one shift that she did not want information given out. It is possible that by explaining the adoption plan to the head nurses respondent believed she was conveying her desire that information regarding the birth be kept confidential.
The hospital received further notice of respondent's wish for confidentiality through an incident involving the baby's visibility in the nursery. Ebrahim visited respondent shortly after delivery and observed the baby in a prominent location in the nursery, near a window, with a card on the bassinet identifying the baby as "Boy Koudsi." Respondent spoke to a hospital employee about moving the baby to the back of the nursery, explaining that "anyone coming in would have seen it and would have known what was going on."
Respondent was discharged on April 19, 1978. A second sister, Karen Powe, called the hospital on or about April 20, having been told by Ebrahim that respondent was at the hospital for tests related to stomach problems. Patient Information at the hospital disclosed to Powe that respondent had been discharged but that the baby had "stayed behind."
Powe confronted respondent with the information at respondent's home, but she denied giving birth. The next day respondent called the hospital asking about herself, and the hospital again disclosed that a baby had been born. That evening Powe and her husband visited respondent and asked again about the baby. Respondent "broke down and admitted" that she had given birth to a baby boy.
The Powes, who had been married for 10 years and were unable to have children, strongly opposed respondent's decision to place the baby for adoption with the society. After two or three discussions in which respondent was "badgered" to give her baby to the Powes, she became uncertain about her decision and asked the society to return her 1-week-old baby to her. Thereafter, for a period of a week, Powe made daily visits to respondent and the baby. Respondent testified that, at the end of the *707 week, "I decided that trying to decide over again what was the best thing to do, it was just too hard on me and it was too hard on [my sister], so I just decided I'd put an end to it and I let her take him."
The child continues to live with Powe, although not yet legally adopted. Respondent's mother, brothers and sisters, and some of her nieces and nephews know that she is the biological mother of the child. The record contains evidence that certain family relationships have deteriorated since the truth about respondent's pregnancy and attempt to place the child was revealed.[1]
The trial court sent this matter to the jury on February 17, 1981, with instructions to consider respondent's claims under the Data Privacy Act and the Patients' Bill of Rights. The jury was instructed that the statutes each prohibit the disclosure of personal and confidential information by a public hospital. By special verdict, the jury found that the hospital had disclosed personal and confidential information about respondent without her approval. Respondent's damages were set at $12,500.
The Patients' Bill of Rights, Minn.Stat. § 144.651 (1980), is a far-reaching policy statement intended to promote the interests and well-being of the patients and residents of health care facilities. Section 144.651(15) provides: "Every patient and resident shall be assured confidential treatment of his personal and medical records, and may approve or refuse their release to any individual outside the facility, except as otherwise provided by law or a third party payment contract." Without expressing an opinion as to what remedies may be available to patients under section 144.651, we hold that oral disclosure of the information involved here, at a time reasonably contemporaneous with the provision of medical services, does not involve "medical records" and is not covered by section 144.651(15). "Medical records" connotes the storage of information in a form ensuring a degree of permanence. Cf. Minnesota Medical Association v. State, 274 N.W.2d 84, 88 (Minn.1978) (discussing the nature of "public records"). Although information stored in medical records might be orally communicated, not all orally communicated medical information comes from permanent records. Information concerning respondent's discharge and the fact that she had given birth, communicated over the telephone by the hospital's Patient Information operator, does not constitute a violation of the confidentiality of respondent's medical records.
The legislature's heightened concern over medical information stored in permanent records is understandable. The life of the information in such records is "radically and artificially prolonged," because the records are "not subject to the erosions of forgetfulness and the promise of eventual obliteration." Gerety, Redefining Privacy, 12 Harv.C.R.-C.L.L.Rev. 233, 288 (1977). "The threat of misuse becomes as permanent as the records themselves." Id. Obviously, the use of information by the Patient Information operator in this case involves a threat distinct from that created by the retention of information beyond its immediate usefulness in providing medical services.
The Data Privacy Act, Minn.Stat. §§ 15.162  .1671 (1978), imposes duties upon data holders with respect to the collection, storage and dissemination of data on individuals. The duty imposed in a particular instance depends upon whether the data is classified as public, private or confidential. Minn.Stat. § 15.162, subds. 2a, 5a, and 5b (1978); Minn.Stat. § 15.1641 (1978).
In the present action, respondent asserts that the hospital, having notice of her desire that the birth not be disclosed to anyone, was limited in its "use and dissemination" of the information "to that necessary for the administration and management of programs specifically authorized by the legislature, local governing body or mandated by the federal government." Minn.Stat. § 15.1641(b) (1978). Such limitation, however, is applicable to only "private" and *708 "confidential" data on individuals. Information acquires the status of "private" or "confidential" data only by operation of "statute or federal law applicable to the data." Minn.Stat. § 15.162, subds. 2a, 5a (1978).
Respondent cites no federal law that would confer "private" or "confidential" status upon the contemporaneous disclosure of a hospital patient's discharge and the fact of a birth.[2] At the time this action arose, the legislation of this state also did not make such information "confidential" or "private." Respondent argues that either the Patients' Bill of Rights, Minn.Stat. § 144.651 (1980), or Minn.Stat. § 144.218, subd. 1 (1978), concerning the confidentiality of an adopted person's original birth certificate, operates to bring the birth information within the protection of the Data Privacy Act. For reasons stated above, the Patients' Bill of Rights can have no such effect.
Section 144.218, subd. 1, on its face applies only to the original certificate of birth and a certified copy of an order, decree or certificate of adoption. It does not purport to cover information from any other source linking the biological mother to the child placed for adoption. We decline to infer from this statute a legislative intent to reach information provided by a Patient Information operator in response to direct inquiry about the mother.
In concluding that the disclosed information in this case is not made "confidential" or "private" by statute or federal law, we do not mean to devalue the significance of a patient's wish for confidentiality[3] within the context of her relationship with a health care provider. As health care becomes more institutionalized and dispersed, the sense that intimate medical information is secure from unauthorized dissemination fades with the image of the family physician. Modern health care systems offer many advantages, some of which are enhanced by the intelligent use of shared medical information. Comment, Public Health Protection and the Privacy of Medical Records, 16 Harv.C.R.-C.L.L.Rev. 265, 274-76 (1981). However, as the technological ability to make productive use of shared medical information increases, the danger of harm to the patient's privacy interests[4] increases proportionally. A primary objective of the Data Privacy Act is to protect the public from that danger not only as related to medical data but in other contexts as well. Nonetheless, even a broad reading of the statute in furtherance of this objective cannot sustain the trial court's conclusion that "personal and confidential information" about respondent was disclosed.[5]
The judgment additionally awarded attorney fees to respondent. Because the *709 statutory provision for award of attorney fees by its terms applies only in the event the Data Privacy Act is violated, Minn.Stat. § 15.166, subd. 1 (1978), attorney fees are not allowable.
Reversed.
NOTES
[1] Respondent's attempts to reconcile her marriage were unsuccessful, but there is no dispute that her former husband knew nothing of the pregnancy and birth. Respondent's claim for damages relates only to her mental anguish and harm to relationships with blood relatives.
[2] Our own examination of federal legislation reveals no support for respondent's claims. The exemption from obligatory disclosure of "personnel and medical files" under the Freedom of Information Act, 5 U.S.C. § 552(b)(6) (1976), is not applicable to this appeal for the same reason that the confidentiality of "medical records" under the Patients' Bill of Rights is inapplicable. The Privacy Act of 1974, 5 U.S.C. § 552a (1976), is similarly restricted in its application to disclosure of "any record which is contained in a system of records." Id. § 552a(b).
[3] Because we hold that the statute is not applicable, it is unnecessary to discuss whether the request for confidentiality was adequate under the Data Privacy Act.
[4] Invasions of privacy and the extent to which they should be proscribed by law are the subject of a great deal of legal and philosophical discussion, but, as yet, no definition of the "right to privacy" has gained widespread acceptance. See Comment, supra at 267 n.14. The invasions of privacy suggested here involve the loss of autonomy and sense of self-worth that results when personal facts are known to others and the loss of anonymity that results when we are made the subject of the attention of others. See Gavison, Privacy and the Limits of Law, 89 Yale L.J. 421 (1980).
[5] In sessions subsequent to the disclosure involved in this action, the legislature enacted a number of specific provisions that classify various types of data as "private," "confidential" or "non-public" data. See Minn.Stat. §§ 15.1672  .1674, 15.1676  .1693, 15.1695, 15.1697  .1699 (1980). We recognize these provisions as a substantial expansion of the rights of data subjects but have no occasion at this time to rule on their application to particular facts.